*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

JESSICA SMEAK, formerly known as JESSICA OLSEN,

　　　　　Plaintiff-Appellee,

v

ZACHARY OLSEN,

　　　　　Defendant-Appellant.

UNPUBLISHED
May 14, 2025
11:01 AM

No. 371820
Ingham Circuit Court
Family Division
LC No. 2019-002466-DM

Before: O'BRIEN, P.J., and K. F. KELLY and BORRELLO, JJ.

PER CURIAM.

Defendant appeals as of right the trial court's order granting plaintiff's motion for sole legal custody of the parties' minor child, GO, and denying defendant's motions for sole legal custody and to modify parenting time. We affirm.

## I. BACKGROUND

The parties married in 2010 and had one child together. In August 2020, the trial court entered a judgment of divorce awarding the parties joint legal and physical custody of GO. The court awarded parenting time to plaintiff every Sunday from 6:00 p.m. to Thursday at 6:00 p.m., and to defendant every Thursday from 6:00 p.m. to Sunday at 6:00 p.m. The court reserved the issue of vaccinations, which the parties were unable to agree on. The court ordered that GO attend Radmoor Montessori School for two years and that defendant contribute $250 per month for tuition.

The parties' inability to coparent began soon after the judgment of divorce was entered. Within a month, plaintiff filed a motion to show cause for defendant's failure to comply with the judgment of divorce concerning GO's schooling, namely his refusal to pay the required $250 per month, to sign a parent handbook, or to sign a waiver of liability. GO was not able to attend school as a result of defendant's refusals. Defendant contended that he was not notified about GO's enrollment, and that plaintiff failed to provide the school with his contact information, so he never received a bill. He also expressed concern with signing the parent handbook and waiver consenting to GO attending the school while unvaccinated because he wanted GO to be vaccinated, and he

-1-

thought that his written agreement with the school could be held against him in court. After a hearing, the trial court found defendant in contempt for failing to abide by the requirement in the judgment of divorce that GO attend Radmoor. Given that Radmoor could no longer accept GO because of the delay, a new school was recommended.

In March 2021, plaintiff filed another motion to show cause for defendant's failure to comply with the judgment of divorce by unilaterally scheduling a doctor's appointment. After a hearing, the trial court declined to hold defendant in contempt, reasoning that plaintiff was equally at fault for unilaterally cancelling the appointment in the first place. The court admonished the parties and encouraged them to find the ability to coparent for GO's sake. In March 2022, plaintiff moved for sole legal custody, arguing that the parties were unable to agree on numerous life decisions for GO, such as what school to attend, what dentist to use, and what medical care to receive. In February 2023, defendant similarly moved for sole legal custody, reiterating similar arguments. Defendant also moved to modify parenting time, requesting an equal split of overnights.

The referee convened a hearing over many months. Plaintiff had remarried in December 2021, and she and her husband, Neil Anderson, lived in Williamston. Defendant lived within minutes of their house. Anderson testified that although exchanges were typically without trouble, sometimes there were issues. Anderson described one particular exchange in which defendant refused to release GO into Anderson's care until plaintiff came to the door.

Defendant provided both health and dental insurance for GO, but the parties otherwise had difficulty scheduling or agreeing on GO's medical care. One of defendant's primary concerns was plaintiff scheduling appointments without consulting him first. Plaintiff typically scheduled appointments because her parenting time occupied the majority of the weekdays, and she explained that she did not consult defendant when making the appointments because doing so would require her to hang up with the medical provider, call defendant, then call the medical provider back, at which point there was a likelihood that the appointment time would already have been taken. Defendant typically opposed the dates chosen by plaintiff, despite his testimony that his work schedule allowed him to essentially set his own schedule. Additionally, defendant frequently cancelled or rescheduled appointments that plaintiff made, reasoning that he needed to be consulted beforehand.

Defendant was prevented from attending one of GO's doctor's appointments, but the parties offered divergent explanations as to why. Defendant testified that plaintiff had actively blocked him from attending by telling the doctor that she was not comfortable with defendant being in the room, while plaintiff testified that only one parent was permitted inside the exam room because of COVID-19 restrictions, and the appointment was during plaintiff's parenting time. Defendant insisted that this could not be the reason he was not allowed in the room because he had called ahead of time and received special permission to be in the room. Defendant claimed that, as a consequence of his not being in the room, GO had an unnecessary blood draw. Plaintiff testified that due to this incident, defendant began cancelling GO's appointments and threatened to cancel GO's insurance unless plaintiff agreed to not block him from future appointments.

The parties also had frequent disagreements over the care GO would receive. Defendant described an incident in which GO was diagnosed with an ear infection. The recommended

-2-

treatment included antibiotics, but, according to defendant, plaintiff refused to allow GO to take the antibiotics because she did not believe that GO needed them. Plaintiff, in contrast, testified that she had merely asked questions of the doctor to explore all options. Plaintiff explained that she was worried about whether the antibiotics contained penicillin, but she eventually agreed to the antibiotics.

The parties also disagreed about which dentist GO should go to. Plaintiff wanted to go to a dentist in Williamston that the parties had used during their marriage, but defendant did not. He asked plaintiff to create a list of dentists outside of Williamston, which she did. Defendant rejected this list, however, and it took over a year and the prospect of court intervention for defendant to finally agree on the dentist that plaintiff originally suggested.

Once the dentist was selected, the disputes continued. Plaintiff testified that defendant later contacted her, claimed that the dentist would not take his insurance, and threatened to cancel the insurance. Plaintiff was able to confirm with the dentist that defendant's insurance was accepted. The parties' issues with scheduling appointments also continued. Defendant again took issue with plaintiff scheduling dentist appointments without consulting him ahead of time. He testified that the dates that plaintiff selected did not conflict with his schedule but he wanted to be part of the scheduling process. According to plaintiff, defendant threatened to reschedule an appointment unless he was included in the scheduling. Defendant similarly became upset when an appointment had to be rescheduled due to the hygienist becoming ill. Even though plaintiff informed defendant of the forced rescheduling, defendant wanted the dentist office to have notified him. Defendant also described a recent dentist appointment in which plaintiff refused to allow GO to receive fluoride treatment despite having received such treatment at a prior appointment.

The parties further disagreed about what eye doctor to choose for GO after his doctor recommended a routine checkup. Plaintiff wanted to select an eye doctor in Williamston, but defendant wanted to select an eye doctor farther away. By the time the referee heard about this dispute, it had been ongoing for six months without any resolution. Defendant testified that plaintiff was to blame for all of the disputes involving GO's medical care.

There were other issues besides the parties' medical disagreements. At GO's preschool graduation, defendant had arrived to the school early and was playing with GO on the playground when plaintiff and Neil arrived. Although the parties presented differing accounts, they agreed that plaintiff approached defendant and GO, and ended up taking GO to the swings. Defendant was upset because this occurred during his parenting time, and he testified that plaintiff essentially took GO away and told defendant to "get over it." In contrast, plaintiff testified that defendant told her to leave but that plaintiff had stated that they should be able to "coexist" for GO's preschool graduation. Plaintiff also testified that GO ran to her and wanted to swing; she denied removing GO from defendant. As defendant, plaintiff, Anderson, and GO all left the playground to go inside the school, plaintiff suggested that they sit together. Defendant became upset, and he and plaintiff argued. Plaintiff testified that defendant threatened to leave with GO. The parties agreed that defendant took GO to his truck and remained there for a period of time to "cool off" before bringing GO inside for the graduation. Anderson and plaintiff testified that GO was visibly shaken by defendant's actions. Anderson also testified that sometime during the graduation, defendant intentionally shouldered Anderson, causing Anderson to fall into a refrigerator. Defendant countered that it was an accidental collision.

There was also disagreement over therapy. Plaintiff notified defendant about concerning statements GO had made, such as, "I'm going to cut you and put you in a cage. I'm going to shoot you. I'm going to punch you. I want to shoot that bird. I'm going to tie you up. I'm going to cut you." Plaintiff also described an incident in which GO put his hands around her neck and told her he was choking her, and that defendant taught him how. Due to GO's concerning statements and conduct, plaintiff desired to enroll GO in play therapy, but defendant would not agree. Instead, he wanted to know the exact dates that GO made the concerning statements. It took court intervention before defendant agreed to the therapy. Defendant testified that he had only ever heard GO say, "I'm going to beat you up," but he believed that this was related to wrestling and said in a playful, non-aggressive manner.

Once in therapy, the issues continued. Plaintiff and Anderson described two instances during a therapy session in which defendant acted aggressively toward them. During the first incident, defendant became upset because GO wanted to speak to the therapist about something unknown to defendant. According to plaintiff and Anderson, defendant cursed at both of them in the hallway, which prompted the therapist to come out and intervene. Later that session, GO was having difficulty leaving with defendant, and plaintiff attempted to comfort GO. Anderson testified that he asked defendant to let plaintiff and GO "have a moment," at which point defendant aggressively cursed at Anderson and raised his voice with GO 5 to 10 feet away. Defendant testified that, during therapy, plaintiff often spoke negatively about him in front of GO and that this negatively affected defendant's bond with GO.

Due to lack of progress, the therapist recommended home-based therapy, but defendant would not agree to this. Defendant testified that he had opposed this type of therapy because he believed it would be used to manipulate GO against him, he could not prevent negative things from being said about him when he was not around, and he did not trust the therapist to handle such situations. Ultimately, GO was dismissed from therapy, and at the time of the referee hearing, he was not in any therapy despite plaintiff's belief that it would be in his best interests. Defendant testified that plaintiff was to blame for the issues with play therapy.

Both parties agreed to raise GO in nondenominational Christianity, but the parties had issues communicating about religious activities. Defendant testified that plaintiff enrolled GO in a weekly children's Bible study program without his knowledge, and after defendant found out about it, plaintiff refused to disclose the location to defendant. Similarly, plaintiff refused to disclose the location of GO's vacation Bible school program. Defendant testified that he would have participated in such programs if given the opportunity. He further testified that he took GO to church on Sundays and read the Bible with GO at home.

There was also a lack of communication regarding plaintiff's relationship with and marriage to Anderson. Namely, plaintiff never informed defendant that she was dating Anderson or had remarried, and defendant instead found out when GO told him on Christmas Eve in 2021. On that day, when defendant picked GO up from plaintiff, GO told defendant that he had "two dads," and defendant attempted to correct him by saying that he had only one dad. Plaintiff in turn told defendant that GO was correct. The parties dispute what happened next. According to defendant, plaintiff yelled at him, followed him to his vehicle, and threatened him over defendant's attempts to correct GO. Defendant also testified that Anderson, whom defendant had never met at that point, came out and also yelled at defendant, and defendant left "within seconds." In

contrast, Anderson testified that defendant yelled at everyone (including GO), got into a "heated argument" with plaintiff, and acted aggressively toward plaintiff and Anderson until he left.

Defendant believed that plaintiff and Anderson consistently tried to interfere with defendant's relationship with GO. Plaintiff would often cry during parenting-time exchanges in front of GO, and defendant testified that this was negatively affecting GO because he was often sad to leave plaintiff. Defendant believed that plaintiff was doing this to intentionally manipulate GO and damage defendant's bond with him. Defendant further testified that there were instances when plaintiff and Anderson would actively block defendant from interacting with GO during activities when they were all together, and defendant thought that GO felt pressured not to spend time with defendant under such circumstances. Defendant said that, in contrast to how Anderson and plaintiff treated him, defendant always attempted to let GO know that issues between the parties were not GO's fault. Anderson and plaintiff disputed most of this; Anderson testified that he had never heard plaintiff say negative things about defendant in front of GO and that she actively encouraged GO's relationship with defendant, and plaintiff testified similarly.

The parties agreed that they were unable to effectively coparent or make decisions together regarding GO, which is why they each requested sole legal custody. Defendant also sought equal parenting time due to his new flexible work schedule, GO's age, and the fact that Anderson was spending more time with GO than defendant. Both parties acknowledged that one of the only areas in which they were able to agree was parenting time—they had been able to make "trades" or "swaps" as needed to accommodate the other's parenting time.

After hearing all the evidence, the referee determined that GO had an established custodial environment with both parties and that defendant's proposed modification to parenting time would not alter this. Accordingly, while the parties needed to establish by clear and convincing evidence that a change in custody was in GO's best interests, defendant only needed to show by a preponderance of the evidence that a change in parenting time was in GO's best interests. The referee examined each of the best-interest factors in MCL 722.23 and found that none of them favored either party or else were inapplicable. The referee also examined each of the parenting-time factors in MCL 722.27a(7) and determined that none of these favored a modification of parenting time. The referee found that defendant's work schedule was similar to his prior schedule, that his desire to spend more time with GO than Anderson did was based on defendant's insecurities rather than GO's best interests, and that GO growing older was a natural progression. The referee accordingly recommended that joint legal custody continue and that the parenting-time schedule remain in place. The referee stressed that, while the parties' behavior was "dysfunctional," neither had demonstrated that they could make better decisions for GO.

The parties objected to the referee's recommendation, but they chose not to submit further proofs to the trial court. After conducting a de novo review, the trial court granted sole legal custody to plaintiff and denied defendant's request for a change in parenting time. Like the referee, the court found that each of the best-interest factors weighed equally for the parties. In support of its determination, the court adopted large portions of the referee's findings as the court's own. The court noted where it disagreed with the referee's findings, and it supplemented some of the referee's findings with the court's own findings. The court adopted the referee's recommendation and findings regarding the parenting-time factors. Unlike the referee, however, the court determined that the evidence showed that the parties were completely unable to coparent and make

decisions for GO's welfare. This made joint legal custody untenable and necessitated the court to step in and select one of the parties to have sole legal custody. On the basis of the evidence presented, the court selected plaintiff as the party best suited to make such decisions:

> The incivility present in this case is affecting the welfare of the child and the Court has to make the difficult decision regarding legal custody. The referee recommended that the joint legal custody continue. Based upon the statute and the cases that the [C]ourt has cited; the Court does find that in this particular case joint legal custody is not in the best interest of this child and sole legal custody must be ordered. The [C]ourt does find that the sole legal custody will be awarded to the [plaintiff] for all of the reasons that I stated on the record; however, this does not give [plaintiff] the authority to preclude [defendant] from the involvement in this child's care and involvement and participating in the . . . medical care being provided to the child. The Court will adopt the recommendations that are contained in the referee's recommended order as it relates to these responsibilities for the [plaintiff] to allow the [defendant] to participate.

This included plaintiff following the recommendations of GO's doctors and allowing defendant to participate in appointments. The trial court reiterated its belief that "[i]f they put as much energy on their dislike for each other, on trying to co-parent, they could work through some of these things." The court concluded:

> There are 13 years left [until GO reaches the age of majority] and as much as the Court believes in each parent having the right to make the decisions, which I don't want to take away from the parent, the effects of their behavior on this child and preventing this child from going to the eye doctor. This report from the referee was issued in August. The referee tried to resolve the conflict with the recommendation and it didn't get resolved. So, I had to, by law, make the change but the parties can always work together. If the parties work together and there is a change of circumstance, the Court would always consider it. . . . So, I'm going to encourage the parents to give a lot of consideration as to how you can use the resources [available to you] not for yourself but for [GO] when you and the other parent don't agree.

This appeal followed.

## II. ANALYSIS

Defendant on appeal challenges whether the trial court used the proper evidentiary standard when making its custody determination, whether the trial court's findings on the best-interest factors were against the great weight of the evidence, and whether the trial court properly denied defendant's request to change parenting time. None of defendant's challenges have merit.

### A. STANDARD OF REVIEW

"In matters involving child custody, all orders and judgments of the circuit court shall be affirmed on appeal unless the trial judge made findings of fact against the great weight of evidence

or committed a palpable abuse of discretion or a clear legal error on a major issue." *Kuebler v Kuebler*, 346 Mich App 633, 652-653; 13 NW3d 339 (2023) (quotation marks and citation omitted). See also MCL 722.28. A finding of fact is against the great weight of the evidence if "the facts clearly preponderate in the opposite direction." *Kuebler*, 346 Mich App at 653 (quotation marks and citation omitted). A trial court in a child-custody case abuses its discretion when it renders a discretionary ruling—such as a decision to change custody—that is "palpably and grossly violative of fact and logic." *Id*. (quotation marks and citation omitted). Clear legal error occurs when a trial court makes a mistake of law, such as misinterpreting or misapplying a statute. See *id*. "This Court reviews the trial court's determination regarding a child's best interests for clear error," giving "deference to the trial court's factual judgments and special deference to the trial court's credibility assessments. *Id*. (quotation marks and citation omitted).

## B. EVIDENTIARY STANDARD

Defendant argues that the trial court failed to set forth and utilize the proper clear-and-convincing-evidence standard when it granted sole legal custody to plaintiff. We disagree.

When moving to change custody, a party must first establish proper cause or change of circumstances. *Kuebler*, 346 Mich App at 668. See also *Vodvarka v Grasmeyer*, 259 Mich App 499, 508-509; 675 NW2d 847 (2003). If this is established, the trial court must determine if the child has an established custodial environment with either of the parents. *Id*. at 669. "Whether an established custodial environment exists dictates the evidentiary burden applicable to the parent seeking to alter a child's environment." *Id*. at 670. This is because a "court is not to change the established custodial environment of a child unless there is presented clear and convincing evidence that it is in the best interest of the child." *Id*. (quotation marks and citation omitted). Reversal is required if a trial court applies the incorrect evidentiary standard when weighing the best-interest factors. See *Griffin v Griffin (Amended Opinion)*, 323 Mich App 110, 123-124, 128; 916 NW2d 292 (2018).

Defendant does not challenge the trial court's determinations on proper cause, change of circumstances, or the established custodial environment—he challenges only the evidentiary standard employed. The referee found that an established custodial environment existed with both parties, and that this finding required application of the clear-and-convincing-evidence standard to any decision whether to change legal custody. The court stated that it was adopting the referee's findings and conclusions unless otherwise explicitly modified. The court adopted the referee's finding that an established custodial environment existed with both parties, and it did not state that it intended to modify the referee's determination of the proper evidentiary standard. From this, it follows that the court utilized the clear-and-convincing-evidence standard. Defendant's concern that the court utilized the preponderance-of-the-evidence standard is unfounded. While the court did not explicitly set forth the applicable standard, it implicitly did so by adopting the referee's findings and recommendation.

## C. CUSTODY

Next, defendant argues that the trial court's findings with respect to several best-interest factors were against the great weight of the evidence. According to defendant, the contested factors should have weighed in his favor rather than both parties equally. We disagree.

Once a trial court has determined whether an established custodial environment exists, it must analyze the best-interest factors listed in MCL 722.23. *Kuebler*, 346 Mich App at 670-671. The only factors that defendant challenges are the following:

> (b) The capacity and disposition of the parties involved to give the child love, affection, and guidance and to continue the education and raising of the child in his or her religion or creed, if any.

> (c) The capacity and disposition of the parties involved to provide the child with food, clothing, medical care or other remedial care recognized and permitted under the laws of this state in place of medical care, and other material needs.

> * * *

> (e) The permanence, as a family unit, of the existing or proposed custodial home or homes.

> * * *

> (j) The willingness and ability of each of the parties to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent or the child and the parents. A court may not consider negatively for the purposes of this factor any reasonable action taken by a parent to protect a child or that parent from sexual assault or domestic violence by the child's other parent.

> * * *

> (*l*) Any other factor considered by the court to be relevant to a particular child custody dispute. [MCL 722.23.]

A trial court must state on the record its findings for each factor. *Kuebler*, Mich App at 671. The trial court weighed factors (b), (c), (e), (j), and (*l*) equally for the parties, and defendant contends that each of these factors should have weighed in his favor.

For factor (b), the trial court determined that both parties were able to provide GO with love, affection, and guidance, and to continue his education and religious upbringing. The court found that plaintiff had been more involved with GO's religious upbringing because there was no evidence of any religious involvement from defendant, but concluded that this did not tip the factor in plaintiff's favor. We agree with defendant that the trial court's finding regarding his religious involvement was against the great weight of evidence because there was evidence that defendant participated in religious activities with GO (namely, going to church and reading the Bible

-8-

together), and defendant said that he would have participated in more religious activities had plaintiff told him about them. That said, we conclude that any error with respect to this finding was harmless because the evidence showed that both parties were religiously involved and the court weighed this factor equally.

Defendant argues that this factor should have favored him because the trial court failed to consider the fact that plaintiff's crying during exchanges was an attempt to manipulate GO against defendant. Plaintiff explained that she often cried during exchanges because she had fear of the unknown and whether she would see GO again if something were to happen to him. While defendant believed that plaintiff's tears were an attempt to manipulate GO against defendant, neither the referee nor the trial court found defendant credible on this point, as evidenced by the fact that neither considered plaintiff crying during exchanges to be an attempt to manipulate GO. We generally defer to the trial court's superior ability to assess the credibility of the witnesses that appear before it, and defendant has not provided any reason for us to deviate from that practice in this instance. See *Kuebler*, 346 Mich App at 653.

Defendant also highlights the manner in which he learned of plaintiff's marriage as evidence that the trial court should have considered to conclude that factor (b) favored defendant. While plaintiff's failure to communicate her marriage to defendant was certainly a poor choice, it had little bearing on whether she had the capacity to give GO love, affection, and guidance, and to continue his education and religious upbringing. We accordingly discern no error in the trial court's supposed failure to consider this fact when assessing factor (b).

For factor (c)—the capacity to provide for the child's material needs and medical care—the trial court adopted the referee's findings with some modifications, namely that both parties were unable to agree regarding GO's medical care. The court referenced vaccinations, fluoride treatment, therapy, COVID testing, and the selection of doctors. Like with the other factors, the trial court did not believe factor (c) favored either party.

Defendant argues that this factor should have favored him because he had the best disposition to provide for GO's medical care and because plaintiff continuously opposed GO's doctors, but, in support of this argument, defendant focuses primarily on his own favorable testimony while ignoring others' testimony that paints defendant in a less-favorable light. For instance, defendant does not mention the fact that, after he was not allowed to attend one of GO's appointments (which plaintiff claimed was due to COVID-19 restrictions), defendant kept cancelling GO's yearly checkup until plaintiff gave up trying to schedule it, and defendant also threatened to cancel his insurance for GO. The evidence also suggests that this was not an isolated incident. The parties batted heads for a year trying to find a dentist, and after they finally did, defendant withheld his insurance card from plaintiff, falsely stated that the new dentist would not take his insurance, and threatened to cancel his insurance. Then, defendant opposed the dentist appointments that plaintiff scheduled. Defendant claims that he was "unartfully" insisting on being present for GO's appointments, but he never testified that he asked plaintiff to reschedule an appointment because he was unable to attend; he just said that he wanted to be consulted before any appointment was scheduled. We agree with the trial court that this demand was not only impractical but evidenced a desire for control regardless of what was in GO's best interests. There are more examples highlighting defendant's inability to make decisions for GO's medical care, and there are also examples of plaintiff creating problems related to GO's medical care. On such

a record, we believe that the trial court's finding that this factor was equal was not against the great weight of the evidence.

For factor (e), the permanence of the family unit for each party's home, the trial court adopted the referee's findings and determined that defendant living alone did not make his home environment more stable. Similarly, the court found that plaintiff remarrying and having a child did not make her home environment less stable. The evidence supported these findings. Both parties lived in Williamston, and there was no evidence suggesting that either home environment or family unit was unstable. We reject defendant's argument that remarrying and having a child necessarily made plaintiff's family unit less stable absent evidence to that effect.

For factor (j), the willingness to foster a relationship between the child and other parent, the trial court adopted the referee's findings and noted that it was a significant factor for legal custody. Like the other factors, the trial court weighed factor (j) equally. Defendant contends that this factor should have favored him because there was no evidence of him trying to negatively affect plaintiff's relationship with GO while there was ample evidence of plaintiff attempting to negatively affected defendant's relationship with GO. Once again, defendant's argument focuses on his own favorable testimony while ignoring the unfavorable testimony of others. Defendant points to the manner in which he learned of plaintiff's remarriage, arguing that this showed a malicious intent to interfere with his relationship with GO. Plaintiff's handling of that situation was undoubtedly troublingly, but it did not show a malicious attempt to interfere with defendant's relationship with GO. Rather, we agree with the trial court that plaintiff at most showed immaturity by failing to recognize that the time and manner in which she chose to share the news of her remarriage was inappropriate.

Defendant insists that factor (j) should have weighed in his favor because some of plaintiff's actions demonstrate "a potential" for or "the beginnings of a parental alienation dynamic." In response, plaintiff rightly notes that her expert witness testified that parental-alienation syndrome was a theory not based in research and which had been rejected by the American Psychiatric Association, and defendant did not offer any expert testimony to rebut this. In reply, defendant cites to *Martin v Martin*, 331 Mich App 224, 238 n 2; 952 NW2d 530 (2020), where this Court recognized that, even if there is "dispute in the scientific community about whether there is a diagnosable, pathological condition called parental-alienation syndrome, there is no reasonable dispute that high-conflict custody disputes frequently involve acts by one parent designed to obstruct or sabotage the opposing parent's relationship with the child." (Citation omitted.) Given this back and forth, we understand defendant to be arguing that plaintiff may, in the future, obstruct or sabotage defendant's relationship with GO because some of her actions are reminiscent of that type of dynamic. This argument is clearly speculative, and the trial court did not err by refusing to credit a speculative argument.

Defendant additionally points to plaintiff's allegations of abuse, which he contends were false, to argue that plaintiff is unwilling to foster a healthy relationship between defendant and GO. A court may consider fabricated allegations of abuse as evidence of an intent to interfere with the other parent's relationship with the child. See *Kuebler*, 346 Mich App at 688-689. Plaintiff testified that she believed defendant was "an abuser" and that GO was not safe around defendant. Defendant testified that during the intake paperwork for play therapy, plaintiff raised concerns of domestic violence against GO, which resulted in defendant being blocked from sessions until the

facility verified that there were no issues. During an exchange, GO complained of a sore throat, and plaintiff, according to defendant, accused defendant of choking GO. The trial court found that plaintiff's position regarding abuse and domestic violence was not credible. However, the court did not find that plaintiff made false accusations against defendant, and we are not persuaded that plaintiff's insinuations of abuse tipped this factor in defendant's favor, particularly in light of the other evidence demonstrating that plaintiff and Anderson actively worked to foster a relationship between GO and defendant.

For factor (*l*), which is any other relevant factor, the trial court adopted the referee's findings and made supplemental findings reiterating the parties' inabilities to coparent or otherwise agree to make decisions regarding GO's well-being. The court drew particular attention to GO's preschool graduation, which it labeled "[t]he ultimate event." The court expressed concern over this incident because it should have been a happy day for GO but was not due to the parties' inability to get along. The court stated that both parties needed to learn how to deal with the other parent without taking out anger or frustrations on GO. The court also highlighted GO's threats to plaintiff and how it took court intervention before defendant agreed to therapy. The court found that defendant's position on therapy being used to manipulate GO against him put the focus on defendant instead of GO; similarly, his threats to remove insurance evidenced a lack of focus on GO's best interests. These findings were amply supported by the record. Defendant argues that, while his assertiveness may have come across poorly, he did everything to ensure that the parties were focused on GO and that his bond with GO was not diminished. This argument, however, ignores the trial court's detailed findings as well as the ample evidence to the contrary.

Ultimately, the parties were essentially in agreement that they could not cooperate and make decisions together, which the record amply supported. This made joint legal custody an unrealistic possibility, as the trial court determined. See MCL 722.26a(1)(b) (listing one factor courts are to consider when determining if joint custody is in the best interests of the child as "[w]hether the parents will be able to cooperate and generally agree concerning important decisions affecting the welfare of the child"). As this Court has explained, "[i]f two equally capable parents whose marriage relationship has irreconcilably broken down are unable to cooperate and to agree generally concerning important decisions affecting the welfare of their children, the court has no alternative but to determine which parent shall have sole custody of the children." *Bofysil v Bofysil*, 332 Mich App 232, 249; 956 NW2d 544 (2020) (quotation marks and citation omitted).

Despite no best-interest factors favoring either party, the trial court determined that plaintiff was better suited for sole legal custody. This was permissible because "[t]he fact that the parents are equally good, or equally bad, or even that one in some respects may be better than the other, is not necessarily the final test." *Heid v Aaasulewski*, 209 Mich App 587, 596; 532 NW2d 205 (1995) (quotation marks and citation omitted). Rather, courts are "to examine all the criteria" to determine what is in the child's best interests—that is the "overriding concern." *Id*. In light of the evidence, we are persuaded that the trial court's decision to award sole legal custody to plaintiff was not an abuse of discretion. The evidence showed that it was plaintiff who took initiative to schedule appointments and find doctors; defendant mostly obstructed her actions and failed to take similar initiative, which often required court intervention. Defendant then placed the entirety of the blame on plaintiff while ignoring his own contributions to the conflict. His obstructing GO's medical care—and his failure to recognize that he was at the very least contributing to the obstruction—

evidenced a lack of focus on GO's best interests. Additionally, plaintiff's parenting time was already during the period in which most important appointments would be scheduled. While plaintiff was certainly not without blame, the trial court's decision to credit plaintiff more than defendant with making important decisions was not against the great weight of evidence or grossly violative of fact and logic.

## D. PARENTING TIME

Defendant lastly argues that the trial court abused its discretion by denying his motion to modify parenting time. We disagree.[1]

Because defendant's requested change to parenting time did not affect GO's established custodial environment, defendant needed to show by a preponderance of the evidence that the change was in GO's best interests. See *Shade v Wright*, 291 Mich App 17, 23, 31; 805 NW2d 1 (2010). Both the statutory best-interest factors in MCL 722.23 and the parenting-time factors in MCL 722.27a(7) "are relevant to parenting time decisions." *Shade*, 291 Mich App at 31. "Custody decisions require findings under all of the best interest factors, but parenting time decisions may be made with findings on only the contested issues." *Id*. at 31-32. When there is no change of custody, a trial court is not required to consider the statutory best-interest factors under MCL 722.23. *Id*. at 32.

Here, the referee found that none of the parenting-time factors supported the requested change, and the trial court adopted these findings. On appeal, defendant does not challenge any of these factors, relying primarily on his analysis of the best-interest factors. For those reasons already discussed, the trial court's findings on the best-interest factors were not against the great weight of evidence, and its rationale was applied to both the custody and parenting-time issues before it. Defendant also argues that GO was struggling with the transitions between the parties and that fewer exchanges would help alleviate this. Defendant highlights that fewer exchanges would mean less in-person contact between the parties, which would lead to less conflict. Defendant blames plaintiff for using the exchanges to create disputes in front of GO and once again contends that she is an alienating parent. However, the record was replete with examples of conflict and disputes in front of GO being caused by defendant (that is, not just plaintiff), such as his threatening to cancel appointments, his rescheduling appointments, his failing to agree on medical care, the preschool-graduation incident, and play therapy. Further, defendant's new work schedule was not too dissimilar from his prior work schedule. Defendant testified that his work schedule had changed such that he was driving less and flying more; however, the trip lengths were the same, and he had previously been able to largely dictate his own schedule. Accordingly, his new schedule represented a small change. Finally, although defendant wanted to spend more

---

[1] As noted by plaintiff, this issue is not appealable by right because it does not involve a final judgment or order granting or denying a motion to change custody or domicile. See MCR 7.203(A)(1); MCR 7.202(6)(a)(*iii*). However, we will, "in the interest of judicial economy, exercise our discretion to treat defendant's claim of appeal as an application for leave to appeal, grant leave, and address" the issue. *Wardell v Hincka*, 297 Mich App 127, 133 n 1; 822 NW2d 278 (2012).

time with GO than Anderson does, defendant presented no evidence as to why this was in GO's best interests.  Instead, as the court noted, this argument seems focused on defendant's needs rather than GO's.

Affirmed.

/s/ Colleen A. O'Brien
/s/ Kirsten Frank Kelly
/s/ Stephen L. Borrello